1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF OREGON

3          THE HON. MICHAEL J. McSHANE, JUDGE PRESIDING

4

5   MICHAEL SHUBIN,                      )
                                         )
6                        Plaintiff,      )
                                         )
7            v.                          ) No. 6:15-CV-00289-MC
                                         )
8   REEDSPORT POLICE OFFICER A.          )
    GARDNER, in his individual           )
9   capacity; REEDSPORT POLICE OFFICER   )
    JON HOLDER, in his individual        )
10  capacity; REEDSPORT POLICE OFFICER   )
    RYAN FAUVER, in his individual       )
11  capacity; and the CITY OF            )
    REEDSPORT, a municipality,           )
12  incorporated in the State of         )
    Oregon,                              )
13                                       )
                         Defendants.     )
14  _____)

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                        EUGENE, OREGON

17                      MONDAY, MAY 2, 2016

18                        PAGES 1 - 27

19

20

21

22                           Kristi L. Anderson
                             Official Federal Reporter
23                           United States Courthouse
                             405 East Eighth Avenue
24                           Eugene, Oregon 97401
                             (541) 431-4112
25                           Kristi_Anderson@ord.uscourts.gov

1   APPEARANCES OF COUNSEL:

2

3   FOR THE PLAINTIFF:

4   Sean J. Riddell
    1300 SE Stark St, Suite 208
5   Portland, OR 97214
    971-219-8453
6   Email: sean.riddell@live.com

7

    FOR THE DEFENDANTS:
8
    Gerald L. Warren
9   Law Office of Gerald L. Warren and Associates
    901 Capitol Street NE
10   Salem, OR 97301
    503-480-7252
11   Fax: 503-779-2716
    Email: gwarren@geraldwarrenlaw.com
12

13

14                    WITNESS INDEX

15   WITNESS          DIRECT  CROSS  REDIRECT

16   Kenn Meneely        3    16     26

17

18

19

20

21

22

23

24

25

1                    EXCERPT OF PROCEEDINGS

2                    TESTIMONY OF KENN MENEELY

3                      MONDAY, MAY 2, 2016

4          THE COURT:  All right.  With the exception of our

5     next witness, everybody can have a seat, and the witness

6     will be sworn.

7          THE CLERK:  Please be seated.  State your name for

8     the record, spelling your last.

9                    *(The witness was sworn.)*

10         THE WITNESS:  My name is Kenn Meneely,

11    M-E-N-E-E-L-Y.

12         THE COURT:  Thank you.

13                    **DIRECT EXAMINATION**

14    BY MR. RIDDELL:

15    Q.   Good afternoon, sir.

16    A.   Good afternoon.

17    Q.   Mr. Meneely, what do you do for a living?

18    A.   Currently, I am a private forensic consultant.

19    Q.   And where did you get your education?

20    A.   Well, to begin with, I have a bachelor's degree in

21    chemistry; studied organic biochemistry and pharmacology in

22    graduate school.

23         I worked for four years in a medical and research

24    facility prior to entering the state police crime laboratory

25    about 37 years ago.

1            Prior to that, three or four years was spent with

2    the military's chemical and biological warfare division,

3    researching various applications and nerve agents and

4    blister agents and so on.

5            I attended the Oregon State Police Academy and

6    received both my basic and advanced police officer

7    certifications, which I maintained throughout the course of

8    my career.

9            Once again, 37 years ago I transferred from the

10   patrol division to the crime lab division, where I

11   subsequently received training from the forensic division,

12   the FBI, the University of Texas Medical School, and the

13   University of Utah, Center for Human Toxicology.

14           I have over a dozen publications in the area of

15   forensic toxicology regarding the clinical effects of drugs

16   alcohol, and medications.  Also, my research has been cited

17   in forensic toxicology textbooks.  Also research work with

18   Dr. Karl Citek, which is the -- what's called a drug

19   recognition evaluation program in Oregon, who is the

20   instructor for the ophthalmology course.

21           For the last eight years I was also a state

22   certified clinical laboratory director for a drug and

23   alcohol rehabilitation facility where I not only analyzed

24   patient's specimens but had one-on-one contact with the

25   patients during the course of their treatment.

1           Over the last 37 years, I have provided training

2    to such groups as prosecutors, judges, police officers,

3    prosecutors -- prosecutors and defense attorneys, all kinds

4    of law enforcement in the area of forensic toxicology.

5           I was a primary lecturer in the area of forensic

6    toxicology in the Oregon State Police program called the

7    Drug Recognition Evaluation Program for about 20 years and

8    which teaches officers the clinical effects of drugs and

9    alcohol, medications as well.

10           During my career with Oregon State Police Forensic

11   Division, I was involved with various aspects of both blood

12   alcohol and breath alcohol testing, which included

13   controlled dosing studies, absorption/dissipation studies,

14   the validation of the breath testing devices called the

15   Intoxilyzer 4000, 5000, 8000 models, if you will, of the

16   devices.  And part of that was the control studies,

17   controlled dosage studies.  As part of he breath testing

18   work was also going through the field sobriety testing,

19   along with the validation studies of that program.

20           Up until my retirement from the State Police Crime

21   Lab as a division toxicology technical leader and supervisor

22   responsible for the procedures, proficiency testing, and

23   also the training of the forensic scientists as well, I was

24   what was called an ASCLD inspector.  That's American Society

25   of Crime Lab Directors.  I was responsible to go to other

1    forensic lab divisions outside of Oregon and medical,

2    examine their laboratories as well for accreditation.

3            I stay current in my field by my association to

4    professional organizations as well as the state crime lab

5    forensic and medical journals and textbooks and other

6    various sorts of technical literature as well.

7            I've been recognized in Oregon for my

8    participation and research in the area of forensic

9    toxicology and impaired driving issues, from the Oregon

10   Prosecutor's Association, the DUI task force and DRE task

11   force as well.  My CV is about 14 pages if you want that.

12   *Q.*    Thank you, sir.

13           Sir, as part of your profession now, are you

14   compensated for your time in providing forensic expertise?

15   A.    I am.

16   Q.    Okay.  Is some of that being involved in the testimony

17   at trials, whether civil or criminal?

18   A.    It is.

19   Q.    And can you give us a percentage of how much of your

20   income is related to testifying in civil cases like this?

21   A.    I can give you an estimate.  The last two years I have

22   testified in two civil cases, so a very small portion.

23   Q.    And you are being compensated for your time here today?

24   A.    I am.

25   Q.    Do you remember how much that is?

1   A.   Well, not for this work today, but for the entire

2   research, the report, and as far as consultation and the

3   time spent, I believe it was -- best of my recollection is

4   $2,000.  It may have been 2500.  I don't remember.

5   Q.   Okay.  Sir, what information have you reviewed in

6   preparation for your testimony and your consultation on this

7   case?

8   A.   I was sent by your office the Reedsport Police

9   Department case files.  There was a supplemental report by

10  Officer Holder and a deposition by Officer Holder and just

11  recently a video of the incident.

12  Q.   Upon reading the reports of Mr. Holder, the deposition

13  of Mr. Holder, and viewing the video of the HGN conducted by

14  Mr. Gardner and Mr. Holder, were you able to form an opinion

15  about whether Officer Holder correctly administered the

16  horizontal gaze nystagmus on Mr. Shubin?

17  A.   I have.

18  Q.   Well, let's begin with the video.

19           Can we go to my computer here?

20           I can represent to you that that's Mr. Shubin and

21  that is Mr. Gardner there preparing to give him the HGN.

22           THE CLERK:  Do you have your phone?

23           MR. RIDDELL:  That might be my computer feedback.

24  Hold on.  Is that better?

25  BY MR. RIDDELL:

1    Q.   All right.  So we are going to take a step back here.

2            As I said, I can represent to you that's

3    Mr. Shubin and Mr. Gardner.

4            On seeing the video -- can you see the video where

5    you are at?

6    A.   I can.

7    Q.   Okay.  What jumps out at you as violations of the HGN

8    standard tests as you look at the video right now?

9    A.   Well, probably describe it first.  The HGN test is

10   three separate or distinct tests, if you will, or segments.

11           First, there is what's called the lack of smooth

12   pursuit, and keep in mind that this is a very standardized

13   procedure, and it's standardized so that every officer does

14   it exactly the same way with no alterations, amendments, or

15   variations and the results -- because it's standardized, all

16   the results are validated based upon the standardization; in

17   other words, everybody does it exactly the same way every

18   time.

19           The first part of the HGN test, HGN is effectively

20   describing the eye movements.  There are small vibrations to

21   the eyes when this HGN test is done.  The first part is

22   called lack of smooth pursuit.  The officer have will the

23   individual stand up with the hands at one's side, feet

24   together, and they'll hold up a pen, a pencil, or a small

25   penlight 12, 15 inches away from the bridge of their nose,

1    and they are instructing the individual to follow it, not

2    with their head, the head is to remain still, follow with

3    their eyes the stimulus or the finger.

4            The point is, is that under standardized rule,

5    that you can only go -- the stimulus can only go so fast; in

6    other words, it can only go about two seconds to the right,

7    back to the center, and two seconds to the left.  And they

8    repeat this maneuver once again.  So, in other words, a

9    total of four seconds from extreme left to extreme right.

10   They will do this test, once again, twice.

11           The second part is called nystagmus at maximum

12   deviation.  And similar to the first test, the stimulus is

13   still 12 to 15 inches away from the bridge of the nose.  And

14   in this test, the stimulus goes to the far side; in other

15   words, about as far as a person can actually see where the

16   whites -- the corners of the whites of the eyes just barely

17   disappear.  And that finger is held there for four seconds.

18           And the officer is looking for the eyes to start

19   to vibrate.  Many describe it as windshield wipers going

20   across a dry windshield.  They start to vibrate as they do

21   this.  And that's what the officer is looking for, that the

22   eyes are starting to -- I say vibrate or twitch.

23           And in both cases, whether the lack of smooth

24   pursuit or the nystagmus at maximum deviation, you are still

25   looking for the eyes to twitch.

1        The last part, the third part of the test, is

2    called angle of onset prior to 45 degrees.  Once again, the

3    officer will slowly move the stimulus the same distance from

4    the head out to where the eyes just barely start to twitch;

5    in other words, prior to 45 degrees, and the officer will

6    measure that based upon the angle to shoulder straight up

7    the nose to 45 degrees, and if they start to, I say, twitch

8    the sooner they start to twitch, generally the higher the

9    alcohol level, or once they get out to close to the 45

10   degrees, the lower the alcohol level in a person.

11   Q.   Back to the video.

12        What stands out as you look at this video as

13   possibly affecting or that the test had been done correctly

14   or incorrectly?

15   A.   If you could stop it just momentarily there.

16        One of the aspects of horizontal -- or doing this

17   test, in ideal conditions, when you do it in controlled

18   conditions, it's room light or daylight conditions and very

19   little distractions, if you will.

20        The difficulty is when you do this test at

21   nighttime because the individual is supposed to focus on the

22   stimulant 12, 15 inches away.  The problem is, is that there

23   is other types of nystagmus that can actually interfere with

24   this.  And the primary one in this case is when officers

25   have their rotating lights or flashing red and blue lights

1  going at the time.  And that's called -- it creates a

2  nystagmus called optokinetic nystagmus.

3        And so what officers are taught to do is actually

4  turn off their rotating lights.  They will have their

5  emergency flashers in the back and the rotating lights so

6  that the individual isn't looking at these flashing lights.

7        And in this case, even though they are not

8  directly looking at the flashing lights, the lights are

9  still flashing and reflecting off the face of the officers,

10  they are reflecting off the tailgate of the pickup and

11  reflecting off the road signs as well.  So there are still

12  flashing lights that can create a false type of a nystagmus.

13  Q.   Now, Mr. Holder has just entered the screen here off to

14  the left.  I can represent to you that Mr. Holder will

15  testify that he saw clues that Mr. Gardner didn't.

16        Is there something wrong with Mr. Holder's

17  positioning about whether he can determine if there is

18  nystagmus or not?

19  A.   The instructions are for the officers to accurately see

20  the clues, if you will, that they are supposed to be

21  observed that you are directly in front of the individual.

22  So standing off to one side in the back -- in fact, I

23  believe Officer Holder came into camera view after Officer

24  Gardner completed the first lack of conversion -- I am

25  sorry, lack of smooth pursuit test.  The one scan, the

1   second officer is back and off to one side and I believe he

2   is --

3   Q.   So we'll back up here.  Let me hit play.

4            What is Officer Gardner doing right there?

5   A.   Officer Gardner appears to be doing the lack of smooth

6   pursuit, where you go to one side versus the other side in

7   about two seconds.

8   Q.   So how many passes do we have before Mr. Holder begins

9   to position himself?

10  A.   It appeared like he's just completing the lack of

11  smooth pursuit test.  This test is the test where he holds

12  the stimulus out to one side for about four seconds, maximum

13  deviation.

14  Q.   While this is playing, can you -- do you have an

15  opinion about whether Officer Holder could accurately

16  determine whether Mr. Shubin had onset prior to 45 or onset

17  at maximum deviation from where Mr. Holder was standing?

18  A.   The officer's off to the back and to one side.  To do

19  this test correctly and observe the clues, if you will, the

20  officer has to be standing directly in front of the

21  individual.

22  Q.   Now, there has been some mention about Mr. Shubin's

23  head moving while Mr. Gardner was conducting the HGN.  Would

24  you like me to replay that so you could see if Mr. Shubin's

25  head was moving or not?

1          MR. WARREN:  Your Honor, I am going to object to

2     him telling what the video shows.  We can all see it for

3     ourselves.

4          THE COURT:  You were the one who mentioned it in

5     opening statement, Mr. Warren.

6          MR. WARREN:  That's what I mean.  It doesn't take

7     an expert to interpret what we are all seeing.

8          THE COURT:  Sustained.  I will let the jury make

9     that determination.

10    BY MR. RIDDELL:

11    Q.   Let me get back to the spot here, the correct spot

12    where Mr. -- oh, jeez.

13          Now, Mr. Holder is stepping up.

14          Is there anything wrong with how Mr. Holder

15    conducts the HGN?  And I can stop the video if you like.

16    A.   Stop.  As I mentioned earlier, the first part of the

17    HGN test is the lack of smooth pursuit, and the standardized

18    technique to get a valid result is that the stimulus, your

19    penlight, goes out to one side and the other side at the

20    speed of two seconds to reach this outer limit and four

21    seconds to reach the other one.

22          It appears that in this video here, it barely

23    makes it one second before they hit the outer parameter, if

24    you will.

25    Q.   So Mr. Holder moves the stimulus too quickly?

1    A.    Too fast, correct.

2    Q.    What about the positioning of Mr. Holder's flashlight?

3    A.    Once again, the idea is that the officer is at least

4    able to see the eyes, not so that you have a flashlight

5    directly in the eyes because that will cause the eyes to

6    actually flinch, if you will, just because of the bright

7    light.

8            But, definitely, the individual is starting to

9    raise their hands.  I believe this is a unique maneuver on

10   Officer Holder's part to, you might say, veer from the

11   standardized methods.

12   Q.    Mr. Shubin's arms are cocked and up by his head there.

13   From reading Mr. Holder's deposition and the report, can you

14   comment on this trick or what Mr. Holder is having

15   Mr. Shubin do with his chin?

16   A.    It was described that the individual crosses their

17   fingers, holds their thumbs up and puts their thumbs

18   underneath the chin.  The problem is it's not part of the

19   standardized protocol of doing this test.  But it also adds

20   one more element is that there is one more stimulus, you

21   might say, involved in this situation where you have the

22   fingers on the outer perimeter of the eyes, as well, where

23   the individual is supposed to be focusing on the stimulus

24   going back and forth, not on his own fingers off to one

25   side.

1   Q.   After reading Mr. Holder's police report, his

2   deposition, and viewing this video, do you have an opinion

3   about whether Mr. Holder conducted the horizontal gaze

4   nystagmus in concert with his training and the science

5   associated with it?

6   A.   I do.

7   Q.   And what is that opinion?

8   A.   He did not.

9   Q.   Now let's move to Mr. Holder's deposition.

10          You had an opportunity to read Mr. Holder's

11  deposition?

12  A.   I did.

13  Q.   Okay.  And you referenced that in your report, correct?

14  A.   I did.

15  Q.   All right.  Are you looking at a copy of his deposition

16  now or your report?

17  A.   Well, just my report.

18  Q.   Okay.  In his deposition, Mr. Holder, when asked, "So

19  your testimony today is that maximum deviation is the same

20  as 45 degrees?"

21          And Mr. Holder answers, "Correct."

22          Is that correct?

23  A.   No.  As I described earlier, there is three separate

24  tests.  Each one is a distinct test.

25  Q.   So if Mr. Holder believes that maximum deviation and 45

1  degrees are the same clue, can you reach an opinion about

2  whether he is looking for nystagmus at the right points for

3  both 45 degrees and maximum deviation?

4  A.   I am not certain what he is really looking at because,

5  once again, they are two distinct tests, and at least one of

6  the tests it appears that the flashlight is shining right in

7  the eyes, which is obviously --

8                    *(Reported interrupted.)*

9              THE WITNESS:  There is three distinct tests,

10  and -- I am trying to remember what I said.  I am sorry.

11  Back up a little bit.

12                    *(Reporter read back.)*

13             THE WITNESS:  The flashlight was directly in the

14  individual's eyes, which is the distraction, if you will,

15  for the test.

16             MR. RIDDELL:  I have nothing further, Your Honor.

17             THE COURT:  All right.  Cross.

18             MR. WARREN:  Thank you, Your Honor.

19                    **CROSS-EXAMINATION**

20  BY MR. WARREN:

21  Q.   Mr. Meneely, you said that you worked at the OSP lab.

22  Is that the one that's been in the news lately?

23  A.   Well, the one that's --

24             MR. RIDDELL:  Objection; relevance, Your Honor.

25             THE COURT:  Sustained.  Excuse me.

1        When did you work at the OSP lab?

2        THE WITNESS:  I retired nine years ago, I believe.

3        THE COURT:  All right.  Folks, I am going to ask

4   you to strike any thought that might be in your mind based

5   on a question that was asked by Mr. Warren.

6        Mr. Warren, I am going to caution you in front the

7   jury, do not ask a question like that.

8        Go ahead.

9   BY MR. WARREN:

10  Q.   You -- what's the highest degree you have earned?

11  A.   Bachelor's degree in chemistry.

12  Q.   You have testified before in court that you had a PhD

13  in toxicology, right?

14  A.   I have.

15  Q.   But you don't have a degree in toxicology, do you?

16  A.   If I can explain that, I don't have a higher degree.

17  About a half a dozen years ago, I completed an online course

18  that, after that, I found out that the university wasn't

19  recognized in Oregon and Washington.  So immediately after

20  learning that, I discontinued any association to that, and a

21  year after that, the Department of Education actually sent

22  me a letter commending me for my -- my disassociation to

23  that university.

24  Q.   Okay.  But it's a university that's not accredited and

25  it doesn't even have a campus, right?

1    A.    Correct.

2    Q.    Just an online university.  But you don't have that on

3    your CV anymore, correct?

4    A.    Correct, for that reason.

5    Q.    And in your CV, you mentioned having a CV.  You said it

6    was 14 pages.  The one that was given to us was ten pages.

7    So you have since updated your CV since this February report

8    that you wrote in this case, right?

9    A.    I have.

10   Q.    And do you have that in front of you, sir?

11   A.    The newest one, yes, I do.

12   Q.    Okay.  And that one I also have a copy of it.  And you

13   put about 61 courses at the end there from 2016, correct?

14   A.    Correct.

15   Q.    And those are courses -- was that something in Las

16   Vegas?

17   A.    Correct.  It's the American Academy of Forensic

18   Scientists.

19   Q.    And most of those sessions that you put down as

20   specialized training, it's like a science fair.  You walk

21   around, there's posters up, the author may be there, and you

22   wrote all those down as some specialized training that you

23   had, right?

24   A.    That's only part of it.  Part of the training is actual

25   presentations.  Part of the training is actual, what they

1   call poster presentations where the scientists, because I

2   have done this before, stand by their work, and other

3   scientists come and interact with scientists.  They have all

4   the research data out there and that's part of their

5   presentation.

6   Q.   And one of those entries that you have on your report

7   on Page 11, at least the Page 11 that I have, it says, 2016,

8   fatal toxicity involving 3-Methoxyphencyclidine.  Did you

9   attend a training on that?

10   A.   There was two trainings that were actually canceled,

11   but, once again, the advantage is that all the scientists

12   are there and still have the ability to interact even though

13   they weren't able to do the presentations.  There was at

14   least two presentations that were canceled.

15   Q.   And that was one of them, right?

16   A.   That was one of them.

17   Q.   And you have just recently testified in *State vs.*

18   *Vollendorf*?  Did you testify in this case?

19   A.   I did.

20   Q.   Did you describe for that court and that district

21   attorney when they asked you questions, did you describe

22   that very case -- that very class that was canceled?  Did

23   you describe a 15- or 20-minute presentation?

24   A.   No.  I described that some of these presentations were

25   canceled, and, once again, as I indicated earlier, that I

1   still had the ability to interact with the presenters even

2   though they didn't actually give a presentation.

3   Q.   So you list that as specialized training even though

4   the class was canceled?

5   A.   Correct.

6   Q.   Okay.  Mr. Meneely, when did you first view the video

7   of the arrest in this case?

8   A.   I received the video the 29th, about two days ago.

9   Q.   So that's the first time you had ever seen any of the

10  field sobriety testing or the HGN testing?

11  A.   Correct.

12  Q.   All right.  The HGN testing, horizontal gaze nystagmus,

13  that's an amazingly actuate test, isn't it?

14  A.   It is.

15  Q.   And that's because the eyes don't lie, right?

16  A.   Correct.

17  Q.   Okay.  And so in this case, you are not actually an

18  instructor in HGN, right?

19  A.   No.

20  Q.   Okay.  So what you have done is you are a scientist,

21  right?  A chemist?

22  A.   Well, I'm a forensic toxicologist that is also involved

23  in what's called the drug recognition evaluation, which we

24  teach officers specialized techniques, and part of those

25  techniques are called HGN, vertical gaze nystagmus, lack of

1    convergence, taking blood pressure, pulse to provide a more

2    adequate or scientific data for detection of alcohol, drugs,

3    and medications.

4    Q.   Right.  And that -- you said that's a DRE course?

5    A.   Correct.

6    Q.   Drug recognition evaluation, I guess?

7    A.   Correct.

8    Q.   And that's about a two-week course?

9    A.   It's a at least two-week course, and then the officers

10   actually go to an on-site place where they -- they call it a

11   wet lab.  It's actually on site for practicing their

12   training on individuals actually affected by drugs and

13   medications and alcohol.

14   Q.   And your part of that two-week was a lecture that was

15   about two hours, right?

16   A.   That's just a part of my participation with the

17   program.

18   Q.   Okay.  What your training was, you were taught how the

19   chemical tests were conducted, correct?

20   A.   That's only a small part of it.

21   Q.   But you weren't teaching HGN, right?

22   A.   No, because the officers already knew how to do the HGN

23   properly by that time in the DRE course.

24   Q.   Okay.  But you are -- in the HGN test, you are not the

25   one who instructs people on how to do it, correct?

1    A.    No.

2    Q.    Correct?  No?

3    A.    That is correct.  I don't instruct people.

4    Q.    Now, did you ever see the results of the BAC in this

5    case?  The blood alcohol test?

6              MR. RIDDELL:  Objection; beyond the scope,

7    relevance to this witness, Your Honor.

8              THE COURT:  Let me talk to the attorneys real

9    quick.

10              *(Sidebar conference was had; not reported.)*

11              THE COURT:  All right.  So you can go ahead and

12    lay a foundation, Mr. Warren.

13    BY MR. WARREN:

14    Q.    Mr. Meneely, you had talked about -- one of your

15    statements in the earlier testimony was about validation

16    studies.  Do you remember mentioning that?

17    A.    Yes.

18    Q.    And a validation study is -- the purpose of a

19    validation study is to correlate the HGN findings with a

20    later blood alcohol test result?

21    A.    Well, that's just a part of validation studies.

22    Q.    Okay.  That's -- in terms of the validation of a -- an

23    individual who shows up with six clues on the HGN, using the

24    lack of smooth pursuit, maximum deviation, nystagmus

25    observed and then nystagmus observed at 45 degrees, if an

1    officer got six clues, what do the validation studies show

2    there is a likelihood of a BAC out of that?

3    A.   What the validation studies show that -- what they

4    actually do is put it in percentages of likelihood.  They

5    state that as 88 percent chance that the blood alcohol is

6    greater than .08.

7    Q.   Okay.  Thank you.  Now, when you mentioned that the

8    officer -- you said -- I think you described the fingers

9    like this, and there may be testimony that's different than

10   that.  But, however, if the officer had the individual hold

11   his head still, you said that was veering from protocol or

12   something like that, I think you said, correct?

13   A.   Correct.

14   Q.   There is nothing in the NHTSA manual, the driving while

15   intoxicated detection and standardized field sobriety

16   testing, you are familiar with the NHTSA guide?

17   A.   I am.

18   Q.   And there is nothing in there that says you can't have

19   slight variations.  In fact, the manual says slight

20   variations don't affect the results, correct?

21   A.   Well, once again, you can have some slight variations.

22   For example, you can actually do the HGN test with the

23   person in a hospital and have accurate results as well.

24   But, once again, they have a very strict protocol.  That's

25   why they call it standardized test.

1    Q.    Sure.  But in terms of what the manual says, it says

2    slight variations will not affect the results of HGN,

3    correct?

4    A.    Correct.

5    Q.    And the -- I think you said you didn't think that

6    Officer Holder could have observed -- did you say he

7    couldn't have observed HGN from where he was standing?

8    Standing back over Officer Gardner's shoulder?

9    A.    Well, first of all, you have to be directly in front of

10   the individual to see movement of the eyes.  And Officer

11   Holder was back and to one side.  His primary job was to --

12   for officer safety, traffic and so on.  But, anyway, he was

13   back to one side.

14   Q.    And when Mr. Holder -- excuse me -- Officer Holder did

15   do the test, he did stand directly in front.  You saw that

16   on the video, right?

17   A.    He did.

18   Q.    You didn't mention anything in your report about

19   flashing lights.  Have you ever given an opinion that

20   flashing lights would affect nystagmus before?

21   A.    This has been reported in the science for other causes,

22   nystagmus.  It wasn't in my report because I just got the

23   video two days ago.

24   Q.    Isn't it typical when police stop individuals and then

25   they perform a DUI that their overhead lights are going to

1  be on?

2  A.   Their overhead lights will be on for a period of time.

3  Then once they begin this aspect of the test, they'll go

4  back and turn on -- turn off the overhead flashing lights

5  for the reason I stated.

6  Q.   And do you know whether or not that was done?

7  A.   According to the video, you can see the lights flashing

8  for the duration of the whole test.

9  Q.   Did you watch the entire arrest video?

10 A.   There was only about a 30-minute video that was

11 provided.

12 Q.   And did you watch the entire thing?

13 A.   That 30 minutes, yes.

14 Q.   And did you see the field sobriety tests that were

15 could be conducted?

16 A.   I saw the HGN, and I believe there was a walk-and-turn

17 and one-leg stand.  I believe that was on there.

18 Q.   Okay.  You didn't give any opinion in your report about

19 those tests, correct?

20 A.   No.  I was only requested to evaluate the HGN test.

21      MR. WARREN:  All right.  That's all the questions

22 I have, Your Honor.

23      THE COURT:  Any redirect?

24              **REDIRECT EXAMINATION**

25 BY MR. RIDDELL:

1  Q.   Sir, regarding the validation test that counsel

2  referred to as 88 percent, that's assuming that the

3  officer -- well, let me ask you this:  Is it safe to say

4  that it has a validation percent of 88 percent if the

5  officer conducting it conducts it correctly?

6  A.   Yes.

7  Q.   And if the officer conducting it is actually seeing six

8  separate clues?

9  A.   Correct.

10        MR. RIDDELL:  Nothing further, Your Honor.

11        THE COURT:  All right.  Thank you, sir.  You are

12  free to go.

13              *(End of excerpt.)*

14

15

16

17

18

19

20

21

22

23

24

25

1          I hereby certify that the foregoing is a true and

2   correct transcript of the oral proceedings had in the

3   above-entitled matter, to the best of my skill and ability,

4   dated this 25th day of May, 2016.

5

6   /s/Kristi L. Anderson

7   _____
    Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25